# Lindquist v. Buckingham Township Board of Supervisors

C.P. of Bucks County, no. 98-6151-23-5.

*Barbara Anisko*, for plaintiffs.
*George M. Bush*, for defendant.

CLARK, *S.J.*, January 19, 2000—

## I. HISTORY

Plaintiffs are the owners of 249.7 acres on York Road, Buckingham Township, Bucks County, Pennsylvania, where they have lived and farmed for many, many years. They filed a sketch plan in October 1994 to develop a portion of the farm as a cluster subdivision, under the AG-1 district under the then existing zoning ordinance, where the farm is located. After several meetings with the township officials, plaintiffs, between October 1994 and August 1995, had their representatives conduct feasibility studies and perform comprehensive testing and analysis. On or about January 6, 1996, plaintiffs submit-

ted to township an application for preliminary subdivision approval of phase I of the proposed development, consisting of 111 clustered single-family lots on a portion of the property, identified as "section A."

Between January 1996 and June 25, 1996, the township's technical consultants issued written reviews of phase I. After a May 1, 1996 meeting with the township planning commission, the commission recommended the granting of a number of waivers from compliance with the Subdivision and Land Development Ordinance (known as SALDO). On August 9, 1996, plaintiffs' counsel submitted a formal request to the township for the recommended waivers. These were considered by the township board of supervisors on October 23, 1996, when the board also confirmed that phase I would be processed under the zoning ordinance amended December 13, 1995.

Under section 508 of the Municipalities Planning Code, the board of supervisors was required to act upon the phase I application within 90 days. However, plaintiffs granted the board five written extensions of the statutory review period through August 30, 1997. The last extension was granted on June 10, 1997.

On June 11, 1997, plaintiffs submitted their phase II application to the township. At that time, the zoning ordinance permitted the proposed development as a "by-right" use without the need for a public hearing or conditional use approval by the board. However, at their meeting on the evening of June 11, 1997, the board enacted an amendment to the zoning ordinance, which, inter alia:

"(1) eliminated cluster subdivision as a 'by-right' use in the AG-1 district and

"(2) required cluster subdivision only as a conditional use."

On June 16, 1997, the township advised plaintiffs that their phase II plan would be reviewed by the township planning commission at its July 2, 1997 meeting. On June 23, 1997, the township advised plaintiffs that their phase I plan was on the agenda of the board's June 25, 1997 meeting.

However, at the June 25, 1997 meeting, the board of supervisors enacted resolution no. 1533 which rejected plaintiffs' application for preliminary approval of both phase I and phase II plans. Thereafter, on September 3, 1997, plaintiffs brought three separate legal proceedings against the township. These proceedings were resolved on November 12, 1997 when the parties entered into a written stipulation of settlement.

This stipulation was made a Bucks County court order on December 12, 1997. That December 12, 1997 order provided, inter alia, that:

"(3) The board hereby withdraws its denial resolution, which withdrawal will become effective upon the approval of this stipulation and settlement by the court.

"(4) The board will permit the Lindquists to submit the revised plans for phase I immediately after this stipulation is approved by the court. Upon the submission of the revised plan for phase I and the acceptance thereof by the board, the original phase I subdivision plans shall be deemed to be withdrawn.

"(5) The board will permit the Lindquists to submit further revised plans to address the comments raised by the board consultants in their respective reviews of the Lindquists' revised plans for phase I and phase II plans. The Lindquists may delay filing revised plans for phase II until the board consultants' comments regarding the

revised plans for phase I have been resolved so that the issues raised with regard to phase I may be consistently treated in phase II.

"(6) The board will allow the Lindquists to discuss with the board consultants (at a public meeting if consultants choose) the issues raised by the board consultants in their respective reviews of the revised plans for phase I, phase II, and any revisions thereof, prior to rendering a decision on the Lindquists' phase I and/or phase II subdivision applications.

"(7) The board will process and review the revised plans for phase I, and any revisions thereto in accordance with the zoning ordinance and SALDO, as they existed on December 13, 1995. The Lindquists shall be permitted to incorporate the understandings as set forth in recital E to this stipulation.

"(8) The board will process and review the phase II plans in accordance with the zoning ordinance and SALDO, as they existed on June 10, 1997. The Lindquists shall be permitted to incorporate the understandings set forth in recital E to this stipulation."

Pursuant to the stipulation, on November 18, 1997, plaintiffs submitted revised phase I plans to the board of supervisors, thereby withdrawing the original phase I plans previously submitted. The revised plans for phase I were accompanied by copies of the township's consultants' review letters and a cover letter by plaintiffs' counsel summarizing the items submitted as part of the revised plans, indicating how the consultants' reviews had been responded to in the revised phase I plans.

On January 2, 1998, the township engineer and the township planner issued separate written reviews of the revised phase I plans. Three meetings then took place on January 7, 1998, January 22, 1998 and February 12, 1998

between plaintiffs' representatives and the township planning commission, township engineer and township planner where the revised phase I plans were reviewed and discussed.

On July 22, 1998, the board of supervisors adopted resolution no. 1598, denying plaintiffs' original phase I subdivision plan dated October 30, 1995, accompanied by township's consultants' review letters dated April 29, 1996 and May 14, 1996 concerning the original phase I plan.

On September 3, 1998, plaintiffs brought this mandamus action against the township, alleging plaintiffs' revised phase I subdivision application should be "deemed approved" under section 508 of the Municipalities Planning Code.

Hearings were conducted by the undersigned on April 16, 1999, June 7, 1999, July 7, 1999 and August 16, 1999. At the conclusion of the last hearing, the court afforded both sides the opportunity to submit requests for findings of fact, conclusions of law and memorandum. These have been received.

Before setting forth its findings, this court wishes to go on record as concluding that it has found plaintiffs' witness, Wesley J. Wolf, a licensed civil engineer in Connecticut, New Jersey and Pennsylvania, to be highly qualified in his field. This court has further found that Mr. Wolf's testimony in this case has been believable and credible. Therefore, upon the basis of Mr. Wolf's credibility and high qualifications, this court has established many of its findings of fact.

However, in evaluating the qualifications of the township's witness, Ernest Knight II, this court finds his qualifications to be not as impressive as those of Mr. Wolf. This court also found that on numerous occasions

in this testimony Mr. Knight was less than candid in his answers to questions, both on direct and cross-examination. Also, this court found that Mr. Knight was attempting to set forth his views in this case in a light most favorable to the township, which supplies him with 95 percent of his annual gross income, or $460,000 a year for the last three years.

In making many of its findings, this court has therefore, on issues in controversy, accepted Mr. Wolf's expert opinions over Mr. Knight's.

By the same token, this court found the testimony of Lynn Froehlich Bush, the township planner consultant, to lack quality in her professional opinions and to lack credibility in her testimony. In so concluding, it should not be overlooked that she is married to the solicitor of this township, a position he has held with the municipality over a long period of time.

Mr. Bush's questioning of this witness could be most gently characterized as "leading."

In making many of its findings, this court has therefore, on issues in controversy, accepted Mr. Wolf's expert opinions over those expressed by Lynn Froehlich Bush and has likewise accepted his recital of fact matters over those expressed by Lynn Froehlich Bush, where they were in controversy.

That being stated of record, this court makes the following:

## II. FINDINGS OF FACT

(1) Plaintiffs, James O. Lindquist and Cora F. Lindquist, his wife, are adult individuals residing on the Lindquist farm adjacent to Route 263, P.O. Box 146, Buckingham, Pennsylvania 18912.

(2) Defendant, the board of supervisors of Buckingham Township, is the governing body of the Township of Buckingham, with its principal offices located at 4613 Hughesian Drive, P.O. Box 413, Buckingham, Pennsylvania 18912.

(3) The Lindquists are the owners of 249.7 acres of land located between Route 263 and Upper Mountain Road in Buckingham Township, Bucks County, Pennsylvania.

(4) At all times material hereto, the Lindquists desired to, and were attempting to develop cluster subdivision consisting of approximately 216 lots on the property.

(5) Approximately 60 acres of the property (front parcel) is located between York Road and the area of the property on which the Lindquist farmhouse, garage and large barn are located.

(6) The front parcel is visually separated from the remainder of the property by the farmhouse, garage, barn and a large stand of mature trees and gently slopes down as it extends from York Road to the farmhouse, garage, barn, and large stand of mature trees.

(7) The front parcel, together with the adjacent Coles property and the western portion of the adjacent Nonesuch farm provides an aesthetically pleasing view from York Road.

(8) Successive board of supervisors of the township have desired to protect the view from destruction by development.

(9) It is the present board who has taken an active interest in preserving farmland.

(10) The adjacent Coles property and the adjacent Yerkes Nonesuch farm have both been preserved and the township proudly admits that it would like to preserve the Lindquist property.

(11) If Lindquist could be preserved by the township there would be a section of over one mile on York Road (Route 263) that would remain farmland.

(12) According to the township's zoning ordinance and zoning map, the property is located in the township's AG-1 zoning district, which permits, inter alia, the development of a cluster subdivision, utilizing transferable development rights.

(13) The firm of Boucher & James prepared the development plans for the Lindquists' property.

(14) Wesley Wolf, a licensed civil engineer, employed by Boucher prepared the development plans for the proposed development.

(15) The proposed development is to consist of two phases.

(16) Phase I is to consist of 111 single-family lots and is to be developed first.

(17) Phase II is to consist of 110 single-family lots and is to be developed in the future.

(18) The development plans for the property were prepared taking into consideration a year-long process of consultations with members of the Buckingham Township Planning Commission wherein the type, location and concentration of the development were discussed.

(19) On or about March 29, 1996, the Lindquists submitted to the board an application for preliminary subdivision approval of phase I of the property, accompanied by a preliminary subdivision plan, prepared in October 1995, depicting the subdivision of the first phase of the property into 111 clustered single-family lots on a portion of the property.

(20) Consistent with industry practice, since the proposed development was to be developed in two phases, the original phase I subdivision plan also identified in a

light dotted line the layout of the roadways and lotting for phase II.

(21) The township at all times knew that the original phase I application was only for phase I of the proposed development.

(22) The layout depicted on the phase I subdivision plan was consistent with the sketch plan previously submitted to the board and the planning commission at a series of meetings.

(23) The development was positioned well off of York Road to preserve the view that the board was seeking to preserve.

(24) The township's planning consultant expressly found many aspects of the site layout advantageous to the township, such as: the large setback from York Road to preserve one of the finest views in the township; clustering the homes together helps to preserve larger areas of open space that are important for protection of natural resources; the large amount of open space preserved as part of the development implements one of the township goals; critical natural features are preserved on this site: wetlands, flood plains and limestone areas as the plan has clustered the development away from these.

(25) When the Lindquists submitted the original phase I subdivision application to the board, the zoning ordinance permitted the subdivision of the property as a cluster subdivision, utilizing transferable development rights, as a "by-right" use in the AG-1 district, without the need for a public hearing or conditional use approval by the board.

(26) When the Lindquists submitted the original phase I subdivision application to the board, the township subdivision and land development ordinance permitted cul-

de-sac streets to be constructed within the proposed development.

(27) The board then amended that ordinance on February 26, 1997 to prohibit cul-de-sac streets.

(28) The original phase I subdivision plan contained cul-de-sac streets as permitted.

(29) The original phase I subdivision application was reviewed by the planning commission at a May 1, 1996 meeting.

(30) At that meeting, there was extensive discussion regarding, inter alia: (a) the original phase I subdivision plan's compliance with subdivision and land development ordinance; (b) a number of waivers from subdivision and land development ordinance requirements that were requested; and (c) the planning commission's agreement to recommend the waivers.

(31) After the May 1, 1996 meeting, on August 9, 1996, the Lindquists submitted to the board a formal request for the waivers that had been recommended by the township planning commission.

(32) On September 18, 1996 and on two occasions thereafter, the Lindquists and their representatives met with the township's staff to discuss, inter alia, the requested waivers.

(33) At an October 23, 1996 public meeting, the board, inter alia: (a) approved the waivers required to develop the property with the layout depicted on the original phase I subdivision plan; and (b) determined that the Lindquist application for phase I would be processed under the zoning ordinance dated August 24, 1994, as amended December 13, 1995.

(34) Between August 1996 and June 1997, the Lindquists spent substantial time and money, working with township consultants, developing a sewage treat-

ment and disposal system to service not only the Lindquists' development but two other large communities to be constructed in the Furlong area.

(35) The board was kept advised of the Lindquists efforts during this time period.

(36) On June 11, 1997, the Lindquists submitted to the township an application for preliminary subdivision approval of phase II of the proposed development together with a subdivision plan.

(37) After completion of the plan for the proposed sewer system, by letters dated June 10, 1997 and June 24, 1997, the Lindquists advised the board of the status of the sewer system for the project and their intent to submit a revised phase I subdivision plan by the end of June and offered to extend the statutory review period on the phase I plan to August 30, 1997.

(38) The original phase I subdivision plan was rejected by the township.

(39) On June 25, 1997, the board enacted resolution no. 1533 rejecting the Lindquists' applications for preliminary approval of both the phase I and phase II subdivision plans.

(40) The board rejected the plans even though it knew that: (a) the Lindquists had offered to extend the statutory review period for the phase I subdivision application to August 30, 1997; (b) the revised phase I subdivision plan, incorporating the agreed plans for the Furlong area sewage disposal system, were being prepared and were to be submitted shortly; and (c) the Lindquists' phase II subdivision application had not yet been reviewed by the township's consultants or the planning commission as required.

(41) After the board denied the subdivision applications, the Lindquists commenced three separate legal

proceedings against the board on September 3, 1997, *i.e.* a civil rights action under 42 U.S.C. §1983, a mandamus action seeking reversal of the board's denial of the subdivision applications, and a land use appeal from the first denial resolution.

(42) The mandamus action sought to compel the board to: (a) revoke their denial of the Lindquists' phase II subdivision application and to follow mandatory statutory procedures in the review and processing of the Lindquists' phase II subdivision application; and (b) revoke their denial of the Lindquists' phase I and phase II subdivision applications and to allow the Lindquists a reasonable opportunity to discuss outstanding issues with township officials and consultants and to submit revised plans.

(43) The legal proceedings commenced by the Lindquists were resolved on November 12, 1997 by a stipulation of settlement signed by the parties and entered as an order of court on December 12, 1997.

(44) The December 12, 1997 order provided, inter alia, that:

"(3) The board hereby withdraws its denial resolution, which withdrawal will become effective upon the approval of this stipulation and settlement by the court.

"(4) The board will permit the Lindquists to submit the revised plans for phase I immediately after this stipulation is approved by the court. Upon the submission of the revised plan for phase I and the acceptance thereof by the board, the original phase I subdivision plans shall be deemed to be withdrawn.

"(5) The board will permit the Lindquists to submit further revised plans to address the comments raised by the board consultants in their respective reviews of the Lindquists' revised plans for phase I and phase II plans.

The Lindquists may delay filing revised plans for phase II until the board consultants' comments regarding the revised plans for phase I have been resolved so that the issues raised with regard to phase I may be consistently treated in phase II.

"(6) The board will allow the Lindquists to discuss with the board consultants (at a public meeting if consultant chooses) the issues raised by the board consultants in their respective reviews of the revised plans for phase I, phase II, and any revisions thereof, prior to rendering a decision on the Lindquists' phase I and/or phase II subdivision applications.

"(7) The board will process and review the revised plans for phase I, and any revisions thereto in accordance with the zoning ordinance and SALDO, as they existed on December 13, 1995. The Lindquists shall be permitted to incorporate the understandings as set forth in recital E to this stipulation.

"(8) The board will process and review the phase II plans in accordance with the zoning ordinance and SALDO, as they existed on June 10, 1997. The Lindquists shall be permitted to incorporate the understandings as set forth in recital E to this stipulation." Exhibit ___.

(45) The December 12, 1997 order gave the Lindquists the right to submit revised phase I subdivision plans to the board which would be governed by the ordinances in effect on December 13, 1995.

(46) The December 12, 1997 order provided that upon submission by the Lindquists of the revised plans for phase I, the original phase I subdivision plans would be deemed withdrawn.

(47) The December 12, 1997 order gave the Lindquists the right to submit further revised plans to address com-

ments raised by the board's consultants in their reviews of the revised plans for phase I and phase II.

(48) The December 12, 1997 order provided that any further revised plans for phase I which were filed by the Lindquists would also be governed by the ordinances in effect on December 13, 1995.

(49) The December 12, 1997 order permitted the Lindquists to delay filing revised plans for phase II until the township consultants' comments regarding the revised plans for phase I had been resolved that the issues raised with regard to phase I could be consistently treated.

(50) On or about November 18, 1997, the Lindquists delivered to the township the revised phase I application, which included a revised subdivision plan for phase I of the property.

(51) The township was not expecting to consider phase II plans until the issues relating to the phase I plans were resolved.

(52) The revised phase I subdivision plan was accompanied with a cover letter that summarized the items that were submitted as part of the revised plans, including copies of the township consultants' review letters of the first submission with annotations by the Lindquists' consultants as to each comment contained in such reviews to indicate how the comments had been responded to in the revised submission.

(53) The revised phase I subdivision plan is dated August 1997 because the Lindquists' consultants were in the process of preparing the revised plans when the board denied the original phase I subdivision plan and the Lindquists' consultants proceeded to complete their revisions to the plans in August 1997 in accordance with the township consultants' review letters.

(54) The revised phase I subdivision plan followed the direction received by the Lindquists from the board as to how to handle certain design aspects of the plan including roadway widths and cul-de-sac streets.

(55) On January 2, 1998, the township engineer issued a written review of the revised phase I subdivision plan.

(56) On January 2, 1998, the township planner issued a written review of the revised phase I subdivision plan.

(57) On January 7, 1998, January 22, 1998, and February 12, 1998, the Lindquists' representatives met with the planning commission, township engineer and township planner to review and discuss the revised phase I subdivision plan.

(58) As a result of those meetings, the Lindquists agreed that they would submit further revised plans for phase I.

(59) To permit them to complete the revisions to the revised phase I subdivision plan and to submit such further revised plans to the board consistent with the terms of the December 12, 1997 order, the Lindquists requested, and at the board's meeting on May 13, 1998, the board agreed, to extend the review period for the revised phase I plan to July 31, 1998.

(60) The further revised plans for phase I were being prepared during this time to address the comments received from the township consultants in review letters and meetings and the significant feedback received from the board at the May 13, 1998 board meeting.

(61) On July 20, 1998 the Lindquists' attorney informed Mark Curfman, the acting township manager, that the further revised plans would be submitted by the end of July and offered an additional extension of time to the board to allow the board time to review the revised plans.

(See July 20, 1998 letter marked as exhibit P-22; pleading admissions marked as exhibit P-31 at 10; contempt motion and answer thereto marked as exhibits P-3 and P-4 at paragraph 32; Wolf, N.T. volume I, p. 62, ll. 7-23.)

(62) The board did not accept the Lindquists' offered extension of the review period beyond July 31, 1998.

(63) In Buckingham Township, extensions of time offered by a developer must be accepted by the board before they are considered effective.

(64) If the board does not accept the offered extension, there is no extension of time.

(65) On July 22, 1998, the board adopted resolution no. 1598.

(66) The board acted on July 22, 1998 so that the Lindquists would not have the opportunity to submit further revised plans to the board, even though the December 12, 1997 order specifically permitted further revised plans to be submitted.

(67) Although the subdivision plan then pending before the board was the revised phase I subdivision plan submitted on November 18, 1997, the second denial resolution denied the original phase I subdivision plan dated October 30, 1995.

(68) The second denial resolution expressly identified the October 30, 1995 original phase I subdivision plan as the plan being acted upon.

(69) Exhibit P-34 is the planning consultant's April 29, 1996 review of the original phase I subdivision plan.

(70) Exhibit P-36 is the planning consultant's January 2, 1998 review of the revised phase I subdivision plan.

(71) The review letters of township consultants referred to in the second denial resolution are the review letters provided by township consultants to the original

phase I subdivision plans and not of the revised phase I subdivision plan.

(72) The second denial resolution does not mention the revised phase I subdivision plans.

(73) The 60 reasons for denial stated in the second denial resolution are the same as those stated in the first denial resolution.

(74) The 60 reasons for denial stated in the second denial resolution pertain to the original phase I subdivision plan and not to the revised phase I subdivision plan.

(75) The reasons for denial contained in the second denial resolution could not relate to the revised phase I subdivision plan because each of those comments was addressed in the revised phase I subdivision plan, when the original phase I subdivision plan was revised to address the identical comments in the first denial resolution.

(76) When the board adopted the second denial resolution, it denied the wrong plan.

(77) The original phase I subdivision plan and the revised phase I subdivision plan are not the same.

(78) The revised phase I subdivision plan was changed to address the comments of the township consultants to the original subdivision plan. (See Wolf, N.T. volume I, p. 56, l. 15 though p. 60, l. 8.) These changes include:

"(a) a redesign of sections of roadways;

"(b) eliminated loop road with cul-de-sac at the westerly portion of the site to provide future connection for adjoining Kaplin tract;

"(c) changes to easterly portion of site along roadway to address certain carbonate comments and alignment comments;

"(d) changes in lots to accompanying roadway changes;

"(e) design of a large green area as a sewage lagoon;

"(f) an increase from three to six detention basins and three smaller water quality basins." Wolf, N.T. volume I, p. 56, l. 15 through p. 60, l. 8.

(79) The second denial resolution does not take into account the changes contained in the revised phase I subdivision plan.

(80) The board was informed that the Lindquists were intending to submit a further revised phase I subdivision plan before the end of July.

(81) When the board attempted to reject the revised phase I subdivision plan, it knew that the Lindquists "were getting closer to compliance with the township ordinances" and wanted to reject the revised phase I subdivision plan before the Lindquists submitted any further revised plans." (See pleading admissions marked as exhibit P-31, pp. 8-9; mandamus answer marked as exhibit P-2 at paragraph 29 and contempt answer marked as exhibit P-4 at paragraph 30 and Rendon admissions marked as exhibit P-30.)

"It was agreed by the planning commission that further plans should be submitted because the *Lindquists' representatives were getting closer to compliance with the township ordinances*. The last meeting was February 12, 1998." Exhibit P-2, paragraph 29. (emphasis added)

"It was agreed by the planning commission that further plans should be submitted because *the opportunists were getting closer to compliance with the township ordinances*. The last meeting was February 12, 1998, but the revised plans were not filed until July 31, 1998." Exhibit P-4, paragraph 29. (emphasis added)

"Q. And the board adopted resolution 1598 on July 22, which denied and rejected the Lindquists' revised phase I application, didn't it?

"A. Yes.

"Q. So they acted—the board of supervisors acted to deny the revised subdivision application before the Lindquists had an opportunity to submit further plans to the township, even though the stipulation specifically permitted further revised plans to be submitted, right?

"A. Yes." Rendon admissions, exhibit P-30, pp. 55-56.

(82) The further revised subdivision plan for phase I was completed on July 31, 1998.

(83) On July 31, 1998, in accordance with the December 12, 1997 order and within the May 13, 1998 approved extension, the Lindquists attempted to submit the further revised subdivision plan for phase I to the board to address the comments raised by the township engineer and the township planner in their respective reviews of the revised phase I subdivision plan, the resolution of certain issues discussed at the January 7, 1998, January 22, 1998 and February 12, 1998 meetings with the planning commission.

(84) Township officials took the further revised phase I subdivision plan into their possession but stated that they would not formally accept them.

(85) Thereafter, the township refused to accept the further revised phase I plan as "revised plan" on the purported basis that the subdivision application had been denied by the second denial resolution. Rendon admissions, exhibit P-30, pp. 64-66.

(86) By letter dated August 27, 1998, the township stated that the board would treat the further revised phase I subdivision plan as a new subdivision application,

which would be governed by the zoning amendment and the subdivision and land development ordinance amendment and not the ordinance in effect on December 13, 1995, as provided for in the December 12, 1997 order.

(87) The township sought to charge the Lindquists another $9,300 as fees for the purported new submission.

(88) The significance of requiring the plans to be submitted as new plans, rather than revised plans, was that as new plans, they would have to comply with current ordinances.

(89) The board knew that the further revised plan would not comply with the zoning amendment and the subdivision and land development ordinance amendment because (a) the subdivision and land development ordinance amendment prohibited cul-de-sac streets and (b) the road layout, for which the Lindquists had previously received approval from the board, did not comply with the township engineers' interpretation of the road design allowed by the subdivision and land development ordinance amendment.

(90) On August 12, 1998, the board adopted resolution 1599 which purported to re-adopt and confirm the second denial resolution, and to retroactively supplement the second denial resolution to include the rejection of the revised phase I application.

(91) The third denial resolution was adopted because the second denial resolution had rejected the wrong plan.

(92) At the time the board enacted the third denial resolution, the statutory review period for the revised phase I subdivision plan had expired on July 31, 1998.

(93) The third denial resolution also provided that the further revised plans submitted by the Lindquists on July

31, 1998 would be treated as a "revised plan" and that the review period would expire on August 31, 1998.

(94) The third denial resolution did not list in the resolution the reasons for the denial of the revised phase I subdivision plan.

(95) On August 26, 1998, the board adopted resolution 1600 to reject the further revised phase I subdivision plan as a "revised plan" and to accept the further revised phase I subdivision plan as a new subdivision application to be reviewed under the zoning ordinance and subdivision and land development ordinance as they existed on July 31, 1998.

(96) The fourth denial resolution was adopted only two weeks after the board reversed its prior decision to allow the July 31, 1998 plans to be processed as revised plans.

(97) The first 57 reasons for the denial as identified in the fourth denial resolution were the same first 57 reasons provided in the first and second denial resolutions, all of which had already been addressed by the Lindquists in the revised and further revised subdivision plans.

(98) The effect of rejecting the July 31, 1998 plans as revised plans and allowing them to be processed as a new plan submission was that the plans would have to be reviewed under ordinances adopted and in effect on July 31, 1998 rather than December 13, 1995.

(99) The township admitted that the effect of rejecting the July 31, 1998 plans as revised plans and allowing them to be processed as a new plan submission was that the plans would have to be reviewed under ordinances adopted and in effect on July 31, 1998 rather than December 13, 1995.

(100) The plans, if considered under the ordinances in effect as of July 31, 1998, could not comply because

two critical modifications had taken place to the ordinance *i.e.* cul-de-sacs were no longer permitted and the development would not require conditional use approval.

(101) It is standard practice and requirement of the MPC for new submissions to be reviewed by the planning commission.

(102) It is standard practice for the planning commission to review new submissions before formal resolution is made with respect to the plans.

(103) The board enacted the fourth denial resolution, ignoring standard practice and the MPC, rejected the further revised plans without providing the Lindquists with any reviews from the planning commission or township consultants.

(104) Lynn Froehlich Bush is a consultant to municipalities on planning and zoning issues.

(105) Bush was a consultant for the township on the Lindquist development plans for zoning issues.

(106) In an attempt to convince the court that the second denial resolution applied to the revised phase I subdivision plan, Bush testified that even though the comments attributable to her in the first denial resolution are identical to those comments attributable to her in the second denial resolution, *i.e.,* paragraphs 2, 3, 4 and 5, these comments still related to the revised phase I subdivision plan.

(107) Bush admitted that the revised phase I subdivision plan contains the additional information that was requested in her April 29, 1996 review letter of the original phase I subdivision plan.

"Q. Now, this letter is four pages long, and it has 16 comments, right?

"A. I believe you're right, uh-huh.

"Q. And your prior review, exhibit 34, was two pages and has seven comments, doesn't it?

"A. It does, because when the second review was—when the second plan was submitted, we got some of the information that I asked for in phase one. In the first letter I said I couldn't do a complete review, because we didn't have information on wetlands or tree removal or flood plains, but we needed it, so by the time the second plan was submitted, I was able to comment on those things.

"Q. So you were able to comment on all of that with regard to the second plan?

"A. As best I could." Bush, N.T. volume II, p. 98, ll. 10-25.

(108) In addition to the submittal that was made on November 21, 1997 with the revised phase I subdivision plan, Bush received additional information from the Lindquists between November 21, 1997 and July 22, 1998.

"Q. Now, in addition to the submittal that we made on November 21, you were given additional information between November 21, 1997, and July 22, 1998, when resolution 1598 rejecting the second plan was adopted, weren't you?

"A. I've got several—received several letters." Bush, N.T. volume II, p. 99, ll. 1-6.

(109) Paragraph 2 of the second denial resolution provides that "it is not possible to confirm the adequacy of the number of lots without additional calculations concerning the net buildable site area. These calculations must be presented in accordance with the formula in article 5, section 502 of the zoning ordinance. Applicant has also failed to designate whether option A or option B is being used for the B2 cluster development." How-

ever, Bush acknowledged that the revised phase I subdivision submittal used option B. Bush admitted that the Lindquists submitted site capacity calculations. (See Bush, N.T. volume II, p. 108, l. 12 through p. 110, l. 7.)

(110) There were no deficiencies in the site capacity calculations. (See Wolf, N.T. volume IV, p. 71, l. 4 through p. 76, l. 24.)

(111) Bush's testimony that the comments in paragraph 2 still related to the revised phase I subdivision plan is not credible since Bush's comments regarding open space requirements as contained in her January 2, 1998 review letter of the revised phase I subdivision plan are different than those contained in her April 29, 1996 review letter.

"Q. Now, let's—just so his honor is clear, what I'm attempting to do, exhibit 45—I'm sorry, exhibit 36 is Mrs. Bush's comments on our November 1997 submittal. Exhibit 34 is her comments with regard to the earlier plan, the 1995 plan. We've already established, Mrs. Bush, that comment number 2 in resolution 1598 is virtually identical to comment number 2 in your April 29, 1996, letter, correct?

"A. I agreed that the content was similar.

"Q. Now, when we get to your review of the 1997 plan, in exhibit 36 you have a different comment with regard to open space, don't you?

"A. I have a lot of—

"Q. I'm sorry, I said the wrong word. With regard to site capacity calculations. That's included in paragraph 8 on page 3.

"A. Yes.

"Q. Right?

"A. Uh-huh." Bush, N.T. volume II, p. 111, l. 14 through p. 112, l. 8.

250

(112) The comments contained in paragraph 2 of the second denial resolution were addressed in the revised phase I subdivision plan and, therefore, could not still relate to the revised phase I subdivision plan. (See Wolf, N.T. volume IV, p. 62, l. 1 through p. 64, l. 25.)

(113) Paragraph 3 in the second denial resolution provides: "Inadequate information has been provided for the township to determine whether the open space requirements have been met. See zoning ordinance section 502." Paragraph 3 of the second denial resolution contains Bush's comments to the original phase I subdivision plan as contained in her review letter of April 29, 1996.

"Q. Let's go on to comment number 3 in the resolution. Comment number 3 says, 'Inadequate information has been provided for the township to determine whether the open space requirements have been met. See zoning ordinance section 502.' Right? Did I read it accurately?

"A. Yes, you did.

"Q. Now, if we go to your April of 1996 letter, that mimics paragraph 3 of that letter, right?

"A. It may well relate. It's a continuation of an ongoing problem of not being able to understand what open space is being proposed and whether the ordinance has been met.

"Mr. Kaplin: Your honor, would you direct the witness to answer my questions and not make speeches?

"The Court: That one was okay.

"By Mr. Kaplin:

"Q. So, we're talking now about open space in paragraph 3 of the resolution, and we're talking about open space in paragraph 3 in your letter of April 29, 1996, aren't we?

"A. I believe that's what your question was, yes.

"Q. Let me say that in another way. This is the set of—that were marked as exhibit 19 at our prior hearing. This is the August 8, 1997 set of subdivision plans, 34 sheets that were actually submitted to the township on November 21.

"Now, I don't know whether you—I'm sure you can't see it. I'm having enough trouble seeing it. But your comments with regard to open space—or, excuse me, the comments with regard to open space in resolution 1598 indicate that sufficient information hasn't been given to substantiate the amount of open space that has been provided, right?

"A. I want to refer to the resolution.

"Q. Well, let me read it. Specifically, 'Inadequate information has been provided for the township to determine whether the open space requirements have been met.'

"A. Yes.

"Q. Okay. And that's similar, if not identical, to your comment back in 1996 with regard to the original plan, right?

"A. The comment still applies." Bush, N.T. volume II, p. 113, ll. 1-23; p. 114, l. 11 through p. 115, l. 7.

(114) Note 40 and 41 on the revised phase I subdivision plan (exhibit P-19) provides information on open space and page 2 of 34 designates the open space area.

"Q. Now Miss—Mrs. Bush also testified with respect to comment no. 3. That it related to the November 9— to the plans submitted in November 1997. That comment reads: 'Inadequate information has been provided for the township to determine whether the open space requirements have been met. See zoning ordinance section 502.'

"Now, how is this comment addressed the 1997 plan?

"A. Well, you have to actually refer to two—couple of different plan sheets. The record plans which comprise of a total of five sheets, which would be sheets 2 through 6—actually, on sheet 2 of 34 of the record plan we provided a detailed area summary of total lots, roadways, cul-de-sacs, as well as open space areas, and over the left side of the plan we had specific lot area information. And then on the cover sheet there was a note 40 dealing with open space.

"I think we went through this previously that this is a cluster subdivision and 50 percent of the base site area which would exclude the right-of-way of Upper Mountain Road or York Road were to remain as open space. In addition, under the used B2, option B with TDRs, 80 percent of this, 50 percent had to be contiguous.

"So, for example, if I had a 200-acre tract, 100 acres of base area of a 100 acres would have to be open space and 88 acres of that or 80 of 100 had to be contiguous.

"So, if you look at note 40, it says: 'The minimum required 50 percent open space area of 124.56 acres for the overall site is comprised of open space A,' which is here, and clearly represented on several plan sheets as open space A. And if you look at the area summary, it says 84.57 acres. Okay? So that's 84.57 acres.

" 'And portions of open space B, north and south of cul-de-sacs A and B.' Open space B is here. So we included this portion north. These are cul-de-sacs A and B, portions north and south. And what we did as in all the open space areas was exclude detention basins, which are not permitted as open space and recreation area. So in case of open space B we had a total of 29.2 acres.

"And then there were several other pieces that were included—open space E, which is here; open space I in the northeasterly, very easterly portion of the site—all

excluding detention basins, for a total of 130.1 acres. So we were required to have 124.56 acres. We had 130.1— well in excess. And that was based at the time the plans were submitted, was based on open space analysis for the entire site."

"The second—excuse me for a minute.

"The second pertains to 80 percent of the open space being contiguous. Our phase line ended here, so essentially the shaded area is phase I. And note 41 says: 'The minimum required 80 percent contiguous open space of 99.7 acres'—so 80 percent of 124.56 would be 99.7— 'for the overall site is comprised of open space area A'— that we previously talked about—'84.57 acres, and the portion of open space B south of cul-de-sac A.'

"And this is for road clear. This would be the contiguous piece of open space and analyzing the site as one big development." Wolf, N.T. volume IV, p. 65, l. 1 through p. 67, l. 20.

(115) Bush admitted that exhibit P-45 is a chart she received from the Lindquists' engineer setting forth a compilation of the open space requirements for the Lindquists' site in accordance with the ordinance.

"Q. That's part of exhibit 45. Now, this chart as I understand it is a compilation of the open space requirements for this site in accordance with the ordinance, and it's broken down into basically three different ways. It treats the site on an overall basis, the whole 249 acres, and calculates the open space that would be required under the ordinance on an overall composite basis. It then, at your request, breaks down the open space calculations on a phase-by-phase basis, doesn't it?

"A. The chart does show that information, yes." Bush, N.T. volume II, p. 99, l. 18 through p. 101, l. 3.

(116) Exhibit P-45 shows the method of calculation of the required open space either on an overall basis or on a phase-by-phase basis.

"Q. I just merely asked you whether this broke down the amount of open space that is required on a phase-by-phase basis. That's just a number, isn't it?

"A. Yes. That's what the titles of this chart show, that's correct." Bush, N.T. volume II, p. 101, ll. 18-22.

(117) Bush acknowledged that at a subsequent planning commission meeting, several one-sheet boards showing the open space areas were presented.

"Q. Excuse me one second. And the truth is, Mrs. Bush, that you were shown a plan at a planning commission meeting, and Wes Wolf showed you in detail where all of those separate areas of open space were.

"A. It was—

"Q. Isn't that accurate?

"A. I honestly don't recall whether that's accurate or not. You submitted a couple of one-sheet boards that were provided to the planning commission but never made a formal submission for me to review or for anyone in the township to review. I can't say whether or not this was part of a planning commission exhibit or not. It may very well. But there was no formal submission made that would allow me to understand where open space A-1 and A-2 are.

"Q. By 'formal submission,' you mean a re-submission of another plan, correct?

"A. Or even a piece of—

"Q. Could you answer yes or no, please?

"A. Yes, yes." Bush, N.T. volume II, p. 102, l. 23 through p. 103, l. 17.

(118) The open space proposed on the revised phase I subdivision plan meets the open space requirements of

the zoning ordinance for option B-2 with TDRs. (See Wolf, N.T. volume IV, p. 77, l. 17 through p.79, l. 25.)

(119) In section 502.A.2 of the zoning ordinance, the minimum open space requirement for a B-2 cluster is 50 percent of the base site area.

"Q. Now I'm at a loss, because I don't have the same ordinance that you have, but let's see about that for a moment. In the B2 cluster, this is in section 502.A.2 of the ordinance, correct, the minimum open space requirement?

"A. For a B2 cluster?

"Q. Yes.

"A. Yes, I see that.

"Q. And the minimum open space requirement is 50 percent of the base site area, isn't it?

"A. Yes, it is." Bush, N.T. volume II, p. 119, ll. 9-19.

(120) The document entitled "Lindquist farm site capacity computations" which was marked as part of exhibit P-33 and submitted with the revised phase I subdivision plan provides that the base site area is 249 acres on the overall site, and, therefore 50 percent for open space would be the 124.55 acres.

"Q. Now, in calculating the base site area, that was done on this document entitled, 'Lindquist farm site capacity computations,' wasn't it?

"A. Yes.

"Q. And basically comes down to that the base site area is 249 acres on the overall site, and, therefore, 50 percent for open space would be the 124.55 acres that you referred to.

"A. Yes.

"Q. And that included in that are flood plains and flood plain soils and wetlands and steep slopes and forests and

all of those items. They all go into the calculation, don't they?

"A. Yes." Bush, N.T. volume II, p. 120, l. 21 through p. 121, l. 9.

(121) Paragraph 4 of the second denial resolution provides: "The township is unable to determine whether basic area and dimensional requirements are met because of the 'sketch' nature of a portion of the plan." Bush admitted that this comment refers to phase II.

"Q. Thank you. Now, coming back to the resolution, paragraph 4 states, 'The township is unable to determine whether basic area and dimensional requirements are met because of the "sketch" nature of a portion of the plan.' I read that accurately, didn't I?

"A. Yes.

"Q. And that correlates with or is similar to—excuse me one second.

"In your January 2, 1998, review of the plan—I'm sorry, of the plan that's submitted in 1997, you said that you were only reviewing phase one, correct?

"A. As I said earlier, I said that because I was—I wanted to avoid, try to avoid some confusion about what was going on with the second phase.

"Q. This comment refers to phase two, doesn't it?

"A. Sure, it does, but we're—" Bush, N.T. volume II, p. 122, l. 13 through p. 123, l. 4.

(122) Bush's testimony that she was confused as to whether the revised phase I subdivision plan included phase II is not credible in that Bush's January 2, 1998 letter expressly recognized that "information on phase II has not been provided, I have reviewed only phase I." (Bush, N.T. volume II, p. 96, l. 24 through p. 98, l. 2.)

(123) Despite Bush's claims that she was confused whether the Lindquists' submissions included both

phases, Bush admitted that the December 12, 1997 order differentiated between phase I and phase II of the proposed development and that separate plans were to be submitted for those phases.

"Q. So this stipulation differentiates between phase one and phase two and the plans for two different sections, right?

"A. It does, I believe because that's how your plans were titled, your plan was titled.

"Q. Could you just give me a yes or no answer, not—

"The Court: I interpret her answer as yes." Bush, N.T. volume II, p. 83, ll. 1-7.

(124) Paragraph 5 of the second denial resolution provides: "Applicant has failed to provide sufficient information for the township to review resource disturbance for forests, slopes, flood plains, wetlands and other resources in accordance with the zoning ordinance section 3101.B." This comment is identical to the comment contained in the April 29, 1996 review letter of the original phase I subdivision plan. (See Bush, N.T. volume II, p. 125, ll. 1-23.)

(125) However, the comment 5 is addressed in the revised phase I subdivision plan insofar as the original plans were revised to provide information as to disturbance of forest land, slope, flood plain areas, flood plain soils, wetlands and limestone areas. (See Wolf, N.T. volume IV, p. 80, l. 1 through p. 81, l. 13; the revised phase I subdivision plan, exhibit P-19 and P-19A.)

(126) Bush admitted that the original phase I plan did not exceed the 20 percent limit on intrusion into forest areas. (See Bush, N.T. volume II, p. 127, ll. 8-22, p. 129, l. 2 through p. 130, l. 11; original phase I subdivision plan, exhibit P-10.)

258

(127) Bush admitted that the revised phase I subdivision plan provides information on disturbed areas.

"Q. You have T-3 there—T-2 there?

"A. Yes.

"Q. Now, with regard to the 1997 plan, the last sheet talks about the disturbed areas, doesn't it?

"A. Yes.

"Q. And this was taken right from the 1997 plans, wasn't it?

"A. Yes, it was.

"Q. And it says forest—it says resource category on the left, doesn't it?

"A. Yes.

"Q. It says forest, total number of acres 79.9, doesn't it?

"A. Yes.

"Q. Disturbed, 17.0, right?

"A. Yes.

"Q. Allowable disturbance 22.2?

"A. Yes.

"Q. Right?

"A. Uh-huh.

"Q. So it gives you all of that information, doesn't it?

"A. That's one part of the information that you gave us, yes." Bush, N.T. volume II, p. 126, l. 9 through p. 127, l. 7.

(128) In fact, the Lindquists advised Bush before the second denial resolution was entered that there was to be no disturbance of wetlands in phase I of the development. (Wolf, N.T. volume IV, p. 81, l. 14 through p. 85, l. 5; January 19, 1998 letter, exhibit P-45; January 20, 1998 letter, exhibit P-41.)

(129) Further, the Lindquists informed Bush before the second denial resolution was enacted that there would

be no disturbance of the floodway. (See Wolf, N.T. volume IV, p. 85, l. 2 through p. 89, l. 7; February 27, 1998 letter, exhibit P-43.)

(130) Ernest Knight II is Buckingham Township's engineer.

(131) 95 percent of Knight's work is for municipal clients and at the present time Buckingham Township is his only municipal client. His average annual gross income from the township for the last three years is $460,000 a year. (N.T. volume III, p. 7, ll. 10-13 and court's exhibit I.) (See also, N.T. volume III, p. 31, l. 20 through p. 34, l. 20.)

(132) Knight reviewed the Lindquists' original phase I subdivision plan filed March 29, 1996. (See Knight, N.T. volume III, p. 8, ll. 4-7.)

"Q. And so of course, you would have reviewed the Lindquist plan which was originally filed in 1996, did you not?

"A. Yes."

(133) Exhibits P-35 and T-4 are Knight's January 7, 1998 [sic] reviews of the revised phase I subdivision plan. (See Knight, N.T. volume III, p. 17, l. 23 through p. 18, l. 12, p. 20, ll. 12-19.)

"Q. Do you recognize P-35?

"A. Yes, I do. It's a review letter that Knight Engineering, our firm prepared.

"The Court: Prepared by you?

"The Witness: It's prepared under my direction.

"The Court: Does it bear your signature?

"Witness: Yes, it does.

"Mr. Kaplin: This is the same as—I'm sorry.

"A. This is a review letter that was prepared for the November 21, 1997 Lindquist planning commission for

phase one of the project. It was a letter addressed to Buckingham Township Planning Commission.

"Mr. Kaplin: May I suggest that exhibit 35, plaintiff's exhibit 35 is the same letter and I believe that we have included the sketch, we may not need to do that.

"The Court: I have no problem with duplicity in this regard. So Mr. Bush, that will be his exhibit even though it may be duplicative of P. 35." Knight, N.T. volume III, p. 17, l. 23 through p. 18, l. 12; p. 20, ll. 12-19.

(134) Paragraph 59 of the second denial resolution refers to a Knight review letter dated June 25, 1996 which was a review of the original phase I subdivision plan prepared in 1995 and submitted in 1996.

"Q. I call your attention to paragraph 59 of the resolution. It's a fact, is it not, that the paragraph refers to a review letter by Knight Engineering, date June 25, 1996, doesn't it?

"A. Yes, it does.

"Q. And that June 25, 1996 review letter was a review of the plan filed, the original plan filed in 1996 in this matter; isn't it? It's a plan prepared in 1995, submitted in 1996?

"A. Correct." Knight, N.T. volume III, p. 43, ll. 6-15.

(135) There is no reference in the second denial resolution to Knight's review letter dated January 2, 1998 which was a review of the revised phase I subdivision submitted in November 1997. (See second denial resolution, exhibit P-23.)

(136) In an attempt to convince the court that the second denial resolution applied to the revised phase I subdivision plan, Knight testified that 27 of the 60 paragraphs contained in the second denial resolution still applied to the revised phase I subdivision plan.

"Q. Following that and as I stated in court at the last hearing, you determined that a certain number of the paragraphs contained within 1598 still applied to that November plan; did you not?

"A. Yes, I did.

"Q. Did I tell you that Mr. Kaplin had asked that we provide the list of the paragraph numbers to him?

"A. Yes, you did.

"Q. And did you write a letter which I am now marking T-10, sending that list to me and to Mr. Kaplin on July 16 of this year?

"A. That is correct.

"Q. All right. Now looking at it a moment, you have mentioned there are 27 different paragraphs; have you not?

"A. I don't know the exact count, but looks like, 27, yes." Knight, N.T. volume III, p. 25, ll. 10-22; p. 26, ll. 14-18.

(137) Although the second denial resolution listed 60 purported deficiencies, Knight identified only 27 of the 60 as purportedly still relevant to the revised phase I subdivision plan submitted in 1997, *i.e.* paragraphs 1, 7, 14, 16-18, 20-23, 25-27, 31, 32, 34, 35, 37, 38, 42, 46, 48, 51, 52, 54, 55, 57.

"Q. Now resolution 1598, projecting [sic] the 1997 plans contains 60 separate items; does it not?

"A. Yes, it does.

"Q. It's your testimony that 27 of these 60 items are still relevant or outstanding with regard to the 1997 plans?

"A. That is correct.

"Q. You were here when Mrs. Bush testified, weren't you?

"A. Yes, I was.

"Q. If I remember correctly, she said that there were five of the 60 items contained in 1598 still outstanding; is that your recollection?

"Mr. Bush: I object to that characterization, her testimony was talking about the zoning items.

"The Court: Was she?

"Mr. Kaplin: Was talking about five of the 60 items that were included; that was my understanding.

"The Court: Hold it. You were here at that time?

"The Witness: Yes, I was.

"The Court: Do you recall her testifying about this?

"The Witness: Yes. And my recollection is that Ms. Bush was referring to her avenue of expertise, meaning zoning. That there were five zoning issues that were unanswered. I'm referring to subdivision and land development issues that are still open.

"By Mr. Kaplin:

"Q. So if we put together the two of your areas of expertise, we have 32 items out of 60?

"A. I don't know if there are other expertise in there that—

"Q. Talking about your expertise and Mrs. Bush?

"A. Yes.

"Q. So there are 27 and five, 32 items between the two of you that you say are still outstanding, meaning they still apply to the 1997 plan, correct?

"A. That is correct." Knight, N.T. volume III, p. 36, l. 24 through p. 38, l. 17.

"Per your request, we have reviewed Buckingham Township resolution no. 1598 to ascertain which items are still open (have not been addressed) with regard to the Lindquist development plans referenced within that resolution.

"The following item numbers relating to Knight Engineering's review are still open issues: 1, 7, 14, 16, 17, 18, 20, 21, 22, 23, 25, 26, 27, 31, 32, 34, 35, 37, 38, 42, 46, 48, 51, 52, 54, 55, 57." Exhibit T-10.

(138) Knight admitted that there are deficiencies listed in the second denial resolution that had already been addressed in the revised phase I subdivision plan and did not apply to the revised phase I subdivision plan. (See Knight, N.T. volume III, p. 40, l. 7 through p. 41, l. 21.)

(139) Paragraph 1 of the second denial resolution provides that "pursuant to the Bucks County conservation letter dated April 26, 1996, the plans are inadequate for erosion and sediment control purposes and do not meet the requirements of the Pennsylvania DER." Paragraph 1 of the second denial resolution cannot relate to the revised phase I subdivision plan because, as Knight admitted, the April 26, 1996 letter referred to in paragraph 1 predates the submission of the revised phase I subdivision plan. (See Knight, N.T. volume III, p. 44, l. 21 through p. 45, l. 15.)

(140) Paragraph 7 of the second denial resolution provides that "all existing features within 500 feet of the site must be shown on the plan." Knight acknowledged that a waiver was required from this SALDO provision and was discussed at a May 1, 1996 planning commission meeting at which time Mr. Stein, the architect for the proposed development had asked "if a aerial photograph could be provided" and Mr. Knight responded, "this would be permitted, however, if further information is needed it is to be provided." (See Knight, N.T. volume III, p. 50, l. 2 through p. 51, l. 8; exhibit P-11, exhibit P-13.)

(141) Paragraph 14 of the second denial resolution provides "easements must be provided for all stormwater swales common to more than two lots, such as the swales in the rear of lots B-54 and B-57." Knight acknowledged that note 21 on the revised subdivision plan marked as exhibit P-19 provides that information as to easements for swales of more than two lots shall be provided on and/or in conjunction with the final plan, address paragraph 14 of the resolution. (See Knight, N.T. volume III, p. 52, l. 8 through p. 53, l. 19.)

(142) Knight acknowledged that if preliminary approval is made subject to the satisfaction of a list of items such as the item that easements be put on the plan between the preliminary and final, his concern that the township's interest to make sure that everything is on the plan that should be on the plan is taken care of.

"Q. And if the preliminary approval is made subject to the satisfaction of a list of items such as the item that the easements be put on the plan between preliminary and final, your concern is taken care of; isn't it?

"A. Quite right.

"Q. Can you answer the question?

"A. Yes, if acceptable to the township in that regard." Knight, N.T. volume III, p. 54, l. 21 through p. 55, l. 4.

(143) Paragraph 16 of the second denial resolution states "a drainage easement must be shown for the existing water course (Watson Creek) and must include the 100-year flood plain." Knight acknowledged that note 21B indicating that "drainage easements shall be provided for Watson Creek" addresses the issue and that the existing plans show the flood plain. (See Knight, N.T. volume III, p. 55, l. 5 through p. 56, l. 11.)

(144) Paragraph 17 of the second denial resolution states "all easements shall be monumented on one side

at the beginning, end, and all changes in direction."
Knight acknowledged that note 21C of the revised phase
I subdivision plan submitted in November 1997, which
provides "metes and bounds descriptions with monu-
ments and legal descriptions shall be provided for all
easements," addresses this issue. (See Knight, N.T. vol-
ume III, p. 56, l. 12 through p. 58, l. 11.)

(145) Paragraph 18 of the second denial resolution
provides "metes and bounds descriptions shall be pro-
vided for all easements." Knight acknowledged that this
item could be a condition of final approval and included
on the plans when they are finally approved and recorded
and that said condition did not have a negative effect on
the health, safety or welfare of the municipality or resi-
dents if done in that fashion. (See Knight, N.T. volume
III, p. 58, l. 13 through p. 59, l. 14.)

(146) Paragraph 20 of the second denial resolution
provides "applicant must submit a general proposal for
maintenance of open space and the method of manage-
ment." Knight acknowledged that note 22 of the revised
phase I subdivision plan which provides "open space,
including stormwater management facilities shall be
owned, maintained, and managed by the Home Owner's
Association" takes care of that issue. (See Knight, N.T.
volume III, p. 60, ll. 4-25.)

(147) Paragraph 21 of the second denial resolution
provides "proposed street names must be submitted for
approval by the board of supervisors." Knight acknowl-
edged that note 21(d) of the revised phase I subdivision
plan submitted in November 1997 states: "Street names
shall be submitted to the Buckingham police department
and the board of supervisors for approval." Knight ac-
knowledged that this could be done before final approval

and as a condition of final approval. (See Knight, N.T. volume III, p. 61, ll. 5-23.)

(148) Paragraph 22 of the second denial resolution provides: "Development streets must be laid out to connect to adjacent development sites." Knight acknowledged that the only adjacent development site is the Buckingham forest property and that on page 3 of exhibit P-19, the revised phase I subdivision plan, the issue is addressed by providing a proposed 50 foot easement for future road connection. (See Knight, N.T. volume III, p. 61, l. 24 through p. 63, l. 20.)

(149) Paragraph 23 of the second denial resolution states: "Road A must be revised to meet all ordinance requirements for a major collector road." Knight acknowledged that the township manager's letter dated November 11, 1996, and marked as plaintiffs' exhibit P-15, sets forth the board's agreement that the main road identified as Road A shall have a cartway width of 32 feet and not 36 feet as required by the ordinance. (See Knight, N.T. volume III, p. 63, l. 20 through p. 65, l. 22.)

(150) Knight admitted that the MPC requires a specific identification as to what the deficiency is that is being claimed.

"Q. The municipal planning code as you well know requires a specific identification as to what the deficiency is; doesn't it?

"A. Yes, it does." Knight, N.T. volume III, p. 67, ll. 4-7.

(151) Paragraph 25 of the second denial resolution provides: "A portion of proposed section A is located on land owned by Buckingham Township. This must be corrected." Knight acknowledged that minutes of the May 1, 1996 planning commission meeting wherein Mr. Stein indicated that the Lindquists would need an ease-

ment from the adjoining property in order to align the entrance with the road and Mr. Knight said the board is willing to obtain the easement. Knight acknowledged that the township is the owner of the property east of the Lindquists' property and it had the ability to grant the easement that is referred to in paragraph 25.

"Q. Now number 25, which I believe is the next item. 'A portion of proposed section A is located on land owned by Buckingham Township. This must be corrected.' Did I read that accurately?

"A. Yes, you did.

"Q. You have exhibit 11 in front of you. The planning commission minutes of May 1, 1996. I call your attention to items 28, 29, 30 treated on page 9, I'll read it. 'Roadways. Mr. Stein said they will need an easement from the adjoining property in order to align the entrance with Mill Road. Mr. Knight said the board is willing to obtain this easement. The commission was in favor of 22 foot cartways.' Did I read that accurately?

"A. Yes, you did.

"Q. The township is the owner of the property next to the—to the north I guess, or to the east of the Lindquist property on which Road A was partially shown on these plans; isn't it?

"A. Yes, it is.

"Q. The township has the ability to grant the easement that you referred to; correct?

"A. That is correct." Knight, N.T. volume III, p. 67, l. 19 through p. 68, l. 19.

(152) Paragraph 26 provides: "Several of the proposed cul-de-sacs do not meet the minimum requirement of 250 feet and must be corrected." Knight acknowledged that the Lindquists had made a waiver request of the cul-de-sac length and that the solicitor's memo to the board

of supervisors in addressing the requested waivers provides: "Similarly, we won't be dealing with the length of streets ending in a cul-de-sac if they are private." (See Knight, N.T. volume III, p. 68, l. 20 through p. 73, l. 11.)

(153) Paragraph 27 of the second denial resolution provides: "The return radius of all cul-de-sacs shall be the same as the outer paving radius of the cul-de-sacs. This requirement has not been met." This comment no longer applied because of the Lindquist request for a waiver and the township's permission to allow the cul-de-sacs to be private. (See Knight, N.T. volume III, p. 75, l. 20 through p. 76, l. 12; waiver request, exhibit P-13; Bush memorandum, exhibit P-14.)

(154) Paragraph 31 of the second denial resolution provides: "Since Road A is a major collector road, intersecting streets must be at least 800 feet apart." Knight acknowledged that at the May 1, 1996 planning commission meeting there was listed a waiver request for cul-de-sac intervals and that the commission agreed. (See Knight, N.T. volume III, p. 78, l. 5 through p. 79, l. 14; exhibit P-11.)

(155) Paragraph 32 of the second denial resolution states: "The radii for all curb returns must be shown on the plans." Knight acknowledged that the radii returns are shown on page 2, 3, 4 and 5 of the record plan marked as exhibit P-19. (See Knight, N.T. volume III, p. 80, ll. 6-25.)

(156) Paragraph 34 of the second denial resolution states: "Site lines must be shown on landscape plans. Adequate site distance must be provided at each intersection." Knight acknowledged that clear sight triangles are shown on pages 14 to 18 of the revised phase I subdivision plans. Knight further acknowledged that cal-

culations for the sight distance could be added. (See Knight, N.T. volume III, p. 81, l. 8 through p. 82, l. 6.)

(157) Paragraph 35 of the second denial resolution provides: "All typical roadway cross-sections, with swales shall be revised to conform with appendix 5 of the subdivision land development ordinance. This includes pavement, cross-slope match, 15 foot wide parabolic swales and swales side slopes." Knight acknowledged that page 33 of the revised phase I subdivision plan shows a typical roadway cross-section with swales.

"Q. Go to 35. 'All typical roadway cross-sections with swales shall be revised to conform with appendix 5 of the subdivision land development ordinance. This includes pavement, cross-slope match, 15 foot wide parabolic swale and swale side slopes.' Did I read that accurately?

"A. Yes." Knight, N.T. volume III, p. 82, l. 23 through p. 83, l. 5.

(158) Paragraph 37 of the second denial resolution states: "Street lights must be shown and installed pursuant to a particular section." Knight acknowledges that there was an agreement with the planning commission as to limiting the number of street lights. (See Knight, N.T. volume III, p. 83, l. 23 through p. 84, l. 18.)

(159) Knight acknowledged that note 37 on the revised phase I subdivision plan provides: "Street lights shall be provided at Road A; York Road intersection, Road A, Road D, intersection and Road A, Road B intersection."

"Q. Now note 37 says: 'Street lights shall be provided at Road A; York Road intersection, Road A, Road D, intersection and Road A, Road B intersection.' Did I read that correctly?

"A. I presume you did."

(160) Knight acknowledged that there are symbols on the plan which show where street lights are to be located. Knight further acknowledged that the second denial resolution does not specify which intersections should have lights and did not. (See Knight, N.T. volume III, p. 84, l. 24 through p. 85, l. 15.)

(161) Paragraph 42 of the second denial resolution states: "Sidewalks and curbs must be provided along all existing and proposed street." Knight acknowledges that at the May 1, 1996 planning commission meeting "the consensus was no sidewalks." (See Knight, N.T. volume III, p. 85, l. 16 through p. 86, l. 6.)

(162) Knight admitted that township staff believed that there should be no parking, curbs, or sidewalks on the through streets. (See Knight, N.T. volume III, p. 86, l. 7 through p. 82, l. 2; exhibit P-14.)

(163) Paragraph 46 of the second denial resolution provides: "A fence or suitable vegetation is required around all detention facilities." Knight acknowledged that note 31 on the revised phase I subdivision plan states: "Fencing will be provided at all detention basin facilities." Knight acknowledged that if a condition of approval of the preliminary plan was that fencing had to be put on the final plan, there would be no detriment to health, safety and welfare. (See Knight, N.T. volume III, p. 87, l. 8 through p. 88, l. 10).

(164) Paragraph 48 of the second denial resolution provides: "The plans must be revised to address the requirements of the township tree protection ordinance. S.R. 9.21K." Note 21E on the revised phase I subdivision plan addressed this comment.

"Tree protection fencing shall be provided between trees to be preserved in construction areas." Exhibit P.23.

(165) Paragraph 51 of the second denial resolution provides: "All plans must clearly state that open space may not be separately sold nor shall such land be further developed or subdivided." Knight acknowledged that note 17 on the revised phase I subdivision plan similarly provided: "Open space land may not be separately sold, nor such land further developed or subdivided." (See Knight, N.T. volume III, p. 88, ll. 11-23.)

(166) Paragraph 52 of the second denial resolution provides: "The plans do not categorize the type of open space to be provided, *i.e.* lawn, natural, recreation, agricultural." Knight acknowledged that on page 2 of the revised phase I subdivision plan "open space A" is identified as agricultural/natural," "open space B" is described as "lawn/natural." (See Knight, N.T. volume III, p. 88, l. 24 through p. 89, l. 21; revised phase I subdivision plan, exhibit P-19.)

(167) Paragraph 57 of the second denial resolution states: "Since the site is located within the Neshaminy Creek watershed stormwater management plan area, run-off from the entire site must be reduced to 75 percent of the pre-development run-off." Knight acknowledged that this comment was a comment prepared in connection with the original set of plans and came out of his original reviews. (See Knight, N.T. volume III, p. 91, l. 11 through p. 92, l. 8.)

(168) Page 9 of the revised phase I subdivision plan which is the first of five pages of the grading and utility plan shows a detention basin in the lower right hand corner adjacent to Road A and a detention basin exactly in the middle of "open space" of the farm, which detention basins were not included in the original 1995 plan.

"Mr. Kaplin: I'm going back to P-19.

"Q. I would like to show you sheet 9 of 34, P-19. This is the first of five sheets of the grading and utility plan. Are you familiar with this plan?

"A. Yes.

"Q. This plan shows a detention basin in the lower right hand corner adjacent to Road A; doesn't it?

"A. Yes, it does.

"Q. Shows a detention basin exactly in the middle of 'open space' of the farm; doesn't it?

"A. Yes, sir.

"Q. Those detention basins were not included on the 1995 plan, right?

"A. Correct." Knight, N.T. volume III, p. 92, l. 11 through p. 93, l. 2.

(169) The detention basins, although not required under any township ordinance, were added in the revised phase I subdivision plans in response to Knight's comments prepared in connection with his reviews of the original plans. (See Wolf, N.T. volume IV, p. 57, l. 15 through p. 58, l. 9.)

(170) Paragraph 55 of the second denial resolution states: "Since the entire property is located in the carbonate geology area, the plans must show compliance with township ordinance 94-06 with particular regard to depressions, wastewater disposal systems, regrading, detention basins and surface drainage channels." Knight acknowledged that this comment was made in connection with the original phase I subdivision plan submitted in 1996.

"Q. Mr. Knight, number 55 of resolution 1598 says: 'Since the entire property is located in the carbonate geology area, the plans must show compliance with township ordinance 94-06 with particular regard to depres-

sions, wastewater disposal systems, regrading, detention basins and surface drainage channels; right?

"A. Yes.

"Q. Now that is a comment again that you wrote with regard to the 1995 plans that were submitted in 1996; correct?

"A. I don't know. I presume it was, but I couldn't say that without looking at the review letter."

(171) Knight acknowledged that the Lindquists provided a carbonate geology response letter. (See Knight, N.T. volume III, p. 96, l. 11 through p. 98, l. 12.)

(172) The township consultants, planning commission and the Lindquist team further agreed that between preliminary and final approvals borings would be completed to satisfy items 3 and 5 on pages 10 and 11 of Knight's January 2, 1998 review because it was impossible or impractical to determine what type of steps have to be taken in carbonate geology until after the plans have been finalized.

"The purpose of this letter is to set forth what the Lindquist farm subdivision team believes to be the result of the three meetings we have had with the Buckingham Township Planning Commission, Lynn Froehlich and Ernie Knight on January 7, 1998, January 22, 1998 and February 12, 1998. The following list of issues contains issues raised by the township consultants and the planning commission and Lindquist team that have been agreed upon. Issues which the planning commission has determined need further consideration and issues that are unresolved.

"Carbonate testing. We have agreed that between preliminary approval and final approval borings will be completed to satisfy items number 3 and 5 on pages 10 and 11 of Ernie Knight's January 2 review." Exhibit 43.

274

(173) Paragraph 38 of the resolution provides: "The grade of all driveways must meet subdivision regulations." Knight acknowledged that a waiver request was made of the planning commission from this requirement. (See Knight, N.T. volume III, p. 101, l. 15 through p. 105, l. 4.)

(174) Knight acknowledged that in his review letter of the revised phase I subdivision plan he indicated that he would reserve comment on the waiver request until he saw a list of all driveways and/or proposed slopes. (Knight, N.T. volume III, p. 107, l. 10 through p. 108, l. 11.)

(175) Thomas Grant Kelso, a planner with the firm of Castle Valley Consultants, worked for the township in connection with the Lindquist proposed subdivision plans. (See Kelso, N.T. volume IV, p. 8, 16, 1999.)

(176) Kelso is not a licensed professional engineer. (See Kelso, N.T. volume IV, p. 9, ll. 4-6.)

(177) Kelso testified that paragraphs 10, 49 and 50 in the first and second denial resolutions related to him. (See Kelso, N.T. volume IV, p. 10, ll. 16-24; exhibit P-18 and exhibit P-23.)

(178) Kelso acknowledged that paragraph 50 in the first and second denial resolutions did not apply to the revised phase I subdivision plan because it was taken care of with a note on the plan.

"Q. All right. Now referring to the second, resolution 1598. How many, if any of those three were still viable, pertinent to the plan that came into the township in November 1997?

"A. Both items, no. 10 and 49, were still pertinent. Item 50, I believe, was taken care of with the note on the plan. It referred to the property being served by public water and sewer. And I think that was agreed upon, un-

derstood, and it was covered in the plan. So I don't believe that item was pertinent, but the other two still were." Kelso, N.T. volume IV, p. 10, 1. 25 through p. 11, 1. 10.

(179) Paragraph 10 of the second denial resolution provides: "Plans must be submitted for the design and location of all sanitary facilities including spray irrigation and lagoon areas. S.R. 5.3.F." (See second denial resolution, exhibit P-23). Kelso, N.T. volume IV, p. 10, 1. 25 through p. 11, 1. 10.)

(180) Paragraph 49 of the second denial resolution provides: "The plans must be revised to show all required water distribution facilities and mains. S.R. 5.3.F.2." (See second denial resolution, exhibit P-23.)

(181) Kelso admitted that paragraphs 10 and 49 in the first and second denial resolutions are identical.

"Q. Now if you compare resolution P-18—I'm sorry, exhibit P-18, which is resolution 1533, and resolution 1598 with regard to the two items that you've testified about, 10 and 49, I believe they're identical, aren't they?

"A. I believe you're correct." Kelso, N.T. volume IV, p. 29, 1. 16-21.

(182) Kelso admitted that there was a substantial amount of detail added to the original phase I subdivision plan as revised in August 1997 and submitted in November 1997.

"Q. Okay. It's also your testimony today that when P—exhibit P-19, the August 1997 plans, were submitted, there was a substantial amount of additional items added to the plans first with regard to demonstrate water rights. That's what you said took care of a lot of the— I'm sorry, I interrupted you.

"A. A lot of the details.

"Q. A lot of the details.

"A. Of the collection conveyance systems.

"Q. And with regard to the sanitary sewer system, there was an 11-million gallon or 10-million gallon lagoon added to this plan, wasn't there, a storage lagoon?

"A. I believe there was.

"Q. Well, let's—if you would take a look with me, I believe it's on page 10 of these drawings, Mr. Kelso.

"A. That's correct.

"Q. If we can show his honor these set of drawings, this large lagoon was added, was it not?

"A. Yes, it was.

"Q. And that was at your direction, was it not?

"A. We need—our direction was what we needed." Kelso, N.T. volume IV, p. 30, l. 7 through p. 31, l. 5.

(183) The revised phase I subdivision plan submitted in November of 1997 took care of a lot of the details that were covered in Kelso's review of the original phase I subdivision plan. The revised phase I subdivision plan showed additional facilities in terms of wastewater and new location for wastewater facilities.

"Q. Now, did the November plans have anything new as far as water and sewer is concerned versus the plans that were originally rejected—actually, they were rejected in June of 1997 and then the November plans were November of 1997. Did they show something different or new?

"A. Yes, they did. They took care of a lot of the details that we had covered in our earlier review of the original set of plans. They showed some additional facilities in terms of the wastewater, and they showed a new location of the wastewater facilities. So there were differences.

"Q. Were those differences directed primarily to the on-site distribution of the water?

"A. The majority of them were. The majority of them pertained to the actual sewer and water lines within the development themselves." Kelso, N.T. volume IV, p. 11, l. 20 through p. 12, l. 11.

(184) Between the time that the first denial resolution was promulgated and the time the second denial resolution was promulgated, Kelso prepared a review of the first revised subdivision plan.

"Q. I will. Between the time that resolution 1533 was promulgated and the time that resolution 1598 was promulgated you prepared your review of the 1997 plans, right?

"A. That's correct.

"Q. And that's T-12?

"A. Correct." Kelso, N.T. volume IV, p. 31, ll. 18-24.

(185) Notwithstanding Kelso's review of the 1997 plans, the second denial resolution does not spell out any of the reported deficiencies that are listed in Kelso's review of the revised phase I subdivision plans.

"Q. And that has, as Mr. Bush took you through it, talks about a number of specific deficiencies in the 1997 plans, doesn't it?

"A. That's true.

"Q. P—resolution 1598 does not spell out the deficiencies that are listed in your letter, does it?

"A. No, it does not. Doesn't detail them." Kelso, N.T. volume IV, p. 31, l. 25 through p. 32, l. 7.

(186) When the Lindquists submitted the original phase I subdivision plan, they were directed to provide a "stand-alone" wastewater treatment system.

"Q. Okay. Thank you. Now I'd like—since Mr. Bush saw fit to go into the history, I'd like his honor to understand a little bit more of the details.

"When we submitted the plans, the 1995 plans, it's correct, isn't it, that we were told—the Lindquist development team—that we would have to prove that the Lindquist development of some 210 or 220 units would have to provide for its own stand-alone wastewater treatment system and its own stand-alone stormwater—or water system. Weren't we told that?

"A. That's correct."

(187) The Lindquist team engaged Del-Val Soils and Environmental Consultants and its subcontractors to investigate the ability to have a stand-alone wastewater system on the Lindquist property and provided for a stand-alone system on the Lindquist property. (See Kelso, N.T. volume IV, p. 32, l. 20 through p. 33, l. 16.)

(188) The requirements imposed upon the Lindquists that they provide a self-sufficient wastewater treatment system are not written anywhere.

"Q. And it's true that when we were involved with this original plan, the 1995 plan, we were told about this self-sufficiency requirement that's not written anywhere, right?

"A. That's true." Kelso, N.T. volume IV, p. 33, l. 23 through p. 34, l. 2.

(189) Bush admitted that the December 12, 1997 court order provided that the board would permit the Lindquists to submit revised plans for phase I immediately after the stipulation was approved by the court. (See Bush, N.T. volume II, p. 84, ll. 2-10.)

(190) Bush admitted that the revised plans dated August 8, 1997 and submitted in November 1997 were the revised plans for phase I referred to in the December 12, 1997 court order. (See Bush, N.T. volume II, p. 84, ll. 11-14; exhibit P-19.)

(191) Despite the December 12, 1997 order, the township and its planning consultant, Bush, processed the phase I revised subdivision plan as a new plan.

"The Witness: Well, the first plan had been rejected and—by resolution 1533. It's a continuation in the sense that it is the same property and the same applicants and the same engineers, but the township, I guess the administration did give it a new number and accepted it as a new plan." Bush, N.T. volume II, p. 10, l. 6 through p. 11, l. 12.

(192) Bush admitted that the December 12, 1997 court order permitted the Lindquists to submit further revised plans to address the comments raised by the township consultants in their respective reviews of the revised plans for phase I and II. (See Bush, N.T. volume II, p. 84, l. 21 through p. 85, l. 5 and p. 85, ll. 8-21.)

(193) Notwithstanding the December 12, 1997 court order, the board processed the further reviewed plans as a new plan submission under ordinances in effect as of July 31, 1998 rather than December 13, 1995 as provided in the December 12, 1997 order. (See Wolf, N.T. volume I, p. 85, ll. 10-14 and p. 101, l. 12 through p. 102, l. 7.)

(194) Knight acknowledged that paragraph 4 of the December 12, 1997 court order permitted the Lindquists to submit revised plans for phase I immediately after the stipulation was approved by the court.

"A. Paragraph number 4 permits the Lindquists to submit revised plans for phase one immediately after the stipulation is approved by the court."

(195) Knight admitted that on November 18, 1997, revised plans were submitted as provided in the stipulation and in fact submitted prior to the court order dated

December 12, 1997. (See Knight, N.T. volume III, p. 111, l. 2 through p. 112, l. 1.)

(196) Knight admitted that contrary to the terms of the December 12, 1997 court order, the township considered the revised phase I subdivision plan as a "new submission."

"Q. They're revised plans aren't they, the plans submitted?

"The Court: Hold it. That is my question.

"Weren't the November 1997 plans a revision of the 1996 plans submitted?

"The Witness: I believe, your honor, that the township considered them as a new submission. . . .

"By Mr. Kaplin:

"Q. And the revised plans are the plans that were submitted on November 18, 1997; aren't they?

"A. We were given those plans to review as a new submission by the township." Knight, N.T. volume III, p. 73, l. 23 through p. 75, l. 6.

(197) Knight acknowledged that the plans that were submitted on July 31, 1998 were further revised plans.

"Q. Based on this stipulation, Lindquist had the right to submit revised plans, re-revised plans, further revised plans, right?

"A. That is correct.

"Q. Paragraph 7, the board will process and review the revised plans for phase one and any revisions thereto in accordance with the zoning ordinance and SALDO as they existed on December 13, 1995, correct?

"A. That is correct.

"Q. Now when we submitted revised plans in the summer of 1998, July 31, 1998, right?

"A. Yes.

"Q. We submitted further revised plans on that date; didn't we?

"A. Yes, you did." Knight, N.T. volume III, p. 112, ll. 10-25.

(198) Knight acknowledged that he reviewed the further revised plans, but this review was not in accordance with the ordinances that were in effect on December 13, 1995 but were in accordance with the ordinances that were in effect on December 31, 1997. (See Knight, N.T. volume III, p. 113, ll. 1-9.)

(199) The board directed Knight to review the further revised plans in accordance with current ordinances and not the December 13, 1995 ordinance.

"Q. That violated the stipulation didn't it, Mr. Knight?

"A. We were directed to review the plan in conjunction with the current ordinance.

"Q. Who?

"A. We—my firm was directed—

"Q. You were?

"A. Yes.

"Q. By whom?

"A. By the board of supervisors." Knight, N.T. volume III, p. 113, ll. 10-19.

(200) The further revised plans were never reviewed by the planning commission nor the Bucks County Planning Commission.

"Q. The plans were never reviewed by the planning commission?

"A. I believe you're correct.

"Q. The plans were never reviewed by the Bucks County Planning Commission?

"A. Not that I'm aware of." Knight, N.T. volume III, p. 115, ll. 19-24.

(201) Knight reviewed the further revised plans on August 26, 1998, which was the same day that the board rejected the plan. (See Knight, N.T. volume III, p. 115, ll. 10-16.)

(202) Knight acknowledged that since his review was issued on August 26, 1998 and the further revised plans were rejected on August 26, 1998, it would have been impossible for the Lindquists or its engineer to communicate a response or attempt to address the comments contained in his August 26, 1998 review letter.

"Q. Not only that, but since your review was issued on the 26th and were rejected on the 26th, it would have been impossible for my client or its engineer to communicate and respond and attempt to address those comments, would it?

"A. You're correct." Knight, N.T. volume, III, p. 115, l. 25 through p. 116, l. 5.

### III. DISCUSSION

As pertains to this case, 53 Pa.C.S. §10508(3) provides:

"Failure of the governing body . . . to render a decision and communicate it to the applicant within the time and in the manner required herein shall be deemed an approval of the application in terms as presented. . . ."

It is plaintiffs' contention that the board of supervisors did not act in time to reject their revised phase I application, which had been submitted on November 18, 1997. They argue persuasively that resolution no. 1598, enacted by the board of supervisors at their meeting on July 22, 1998 did not address the aforesaid revised phase I plan, but rather addressed the original phase I plan. In support of that argument, they point out that (a) there is

no reference in no. 1598 to the *revised* phase I plan; (b) the 60 reasons for rejection set forth in no. 1598 are identical to the 60 reasons set forth in resolution 1533 when the board of supervisors rejected the original phase I plan on June 25, 1997; (c) P-19, the *revised* phase I plan, addressed those 60 reasons and P-19 has substantial differences from the original phase I plan; and (d) their attached consultants' letters refer to the original phase I plan, *e.g.,* their planner's letter is dated April 29, 1996, and their engineer's letter bears the date May 14, 1996 which are 18 and a half and 18 months prior to the submission date of November 18, 1997 for the *revised* phase I plan.

They also point out that the then township manager, Deborah H. Rendon, acknowledged in her deposition of October 7, 1998 that the township "blew it." (N.T., p. 62, ll. 10-15.) In addition, they point out that the board of supervisors, in recognizing their mistake, enacted resolution no. 1599 on August 12, 1998, readopting no. 1598 but with the additional wording that they were denying the "revised phase I plan." And that then 14 days later the board of supervisors adopted resolution no. 1600, again denying the *revised* phase I plan, and further providing that plaintiffs' submission of July 31, 1998 be treated as a *new* plan subject to the current ordinances and for which the township wanted an additional fee of $9,300.

Plaintiffs further argue that these matters should be considered in light of the township's stated goal to preserve the Lindquist property. (See paragraph 3 of township's answer to plaintiffs' petition for contempt.). (See also, paragraph 26 of the same answer wherein the township states it would like to preserve the Lindquist farm in the same manner as Yerkes Nonesuch and the

Coles farms were preserved. They argue in addition that it should not be forgotten that the board of supervisors amended the zoning ordinance on June 11, 1997 eliminating cluster subdivision using TDRs as a "by-right" use in the AG-1 zoning district and requiring all new cluster division submissions to be treated as conditional uses. They also note that the board of supervisors on February 26, 1997 amended the zoning ordinance to prohibit "cul-de-sac" streets anywhere in the township.

It is further argued that the township has acted in this case not only in violation of the order of December 12, 1997 of the Bucks County Court, but also in violation of its own ordinances requiring review of subdivision applications. We agree with plaintiffs on all of the above arguments and, therefore, we conclude the township's rejection was not timely as required by section 508 of the MPC.

As a back-up position, plaintiffs argue that if, for some reason, it is concluded that the township acted within the required time constraints, that its resolutions lacked the required references of section 10508(2) of the municipalities planning code in not: (a) specifying the defects found in the revised application; (b) describing the requirements which have not been met; and (c) citing the provisions of the statute or ordinance relied upon. Again, we agree with plaintiffs' arguments. No. 1598 lists the same 60 reasons from no. 1533, which dealt with the original phase I submission. However, P-19, the revised phase I plan, is substantially different from the original submission and many of the aforesaid 60 reasons are no longer at issue. Therefore, the township has also violated section 10508(2) of the MPC by failing to address the new criteria of P-19.

## IV. CONCLUSIONS OF LAW

(1) An action in mandamus is appropriate to obtain recognition of the right to "deemed" subdivision approval where the governing body's denial of a subdivision application fails to comply with the requirements of section 508 of the Municipalities Planning Code.

(2) The court may enter peremptory judgment at any time after the filing of the mandamus complaint if the right of plaintiff is clear. See Pa.R.C.P. 1098; *Thayer v. Lincoln Borough*, 687 A.2d 1195 (Pa. Commw. 1997).

(3) "Section 508 requires that deemed approval be granted where no timely written decision is communicated to the applicant *or where a decision denying approval does not include citation to the specific ordinance provisions relied upon. We think mandamus is an appropriate remedy in either instance* since the applicant in both cases is *not* seeking review of the substance of the decision. Instead the applicant is seeking a determination that the municipality has failed to comply with the notice requirements of section 508." *Croft v. Board of Supervisors of Middletown Township*, 76 Pa. Commw. 488, 493, 464 A.2d 625, 627 (1983). (emphasis added)

(4) Section 508 requires that a governing body render and communicate its decisions on an application for subdivision approval within the time limits specified in the MPC. In this case, the review period for the revised phase I subdivision plan expired on July 31, 1998, and although an offer to extend the review period was made by the Lindquists, the offer was rejected. Therefore, the board was required to take action on the revised phase I subdivision plan by July 31, 1998.

(5) The only action taken by the township's board of supervisors prior to July 31, 1998 was adoption of the

resolution 1598 (the "second denial resolution") on July 22, 1998.

(6) Resolution 1598 did not relate to the revised phase I subdivision plan; rather expressly stated that it addressed the subdivision plan "dated October 30, 1995 and revised with the filing of a single sheet site layout plan dated August 9, 1996." Therefore, no action was taken by the board on the revised phase I subdivision plan by July 31, 1998.

(7) When the board adopted resolution 1598, it denied the wrong plan. See *Rodier v. Township of Ridley*, 142 Pa. Commw. 370, 597 A.2d 279 (1991), wherein "deemed approval" was sustained where township's mailing before notice deadline was undeliverable because of insufficient postage, and final notice mailing bore a postage meter date after deadline.

(8) Resolution 1599 and resolution 1600 adopted on August 12, 1998 and August 26, 1998 respectively, were out of time.

(9) Accordingly, pursuant to section 508(3), the revised phase I subdivision plan must be deemed approved.

(10) Section 508(2) requires that a decision of the governing body rejecting a plan must: (a) specify the defects found in the application; (b) describe the requirements of the MPC or the local ordinance which have not been met; and (c) provide citations to the specific provisions of the statute or local ordinance relied upon.

(11) The requirements of section 508(2) of the MPC are mandatory and may not be waived by the court.

(12) "Section 10508(2) is quite clear, '... the decision *shall* specify the defects ... and *shall* cite the provisions of the statute or ordinance ruled upon.' (emphasis added) Generally, words are construed to mean their common usage. 1 Pa.C.S. section 1903. By definition, 'shall' is

mandatory. Accordingly, there is no latitude for overlooking the plain meaning of section 10508(2) to reach a more desired result." *Coretsky v. Board of Commissioners of Butler Township*, 103 Pa. Commw. 28, 519 A.2d 571 (1987).

(13) Where a written decision of the governing body fails to cite the specific provisions of the ordinance relied on for denying an application, the application for land development shall be "deemed approved."

(14) Where a decision of the governing body fails to describe the specific defects in the plan and the requirements which were not met, the application for land subdivision approval shall be "deemed approved."

(15) In this case, resolution 1598 does not identify any defect in the revised phase I subdivision plan, does not describe any requirement or ordinance which has not been met in the revised phase I subdivision plan, and, does not cite to a provision of a statute or ordinance on which the board purportedly relied in denying the revised phase I subdivision plan. The only reasons stated are alleged defects in the original phase I subdivision plan.

(16) The board's own consultants conceded that approximately one-half of the alleged defects listed in resolution 1598 do not apply to the revised phase I subdivision plan.

(17) The board's own consultants acknowledged that the remainder of the alleged defects were either addressed in the revised phase I subdivision plan or were waived by the board at the October 23, 1996 board meeting and in the December 12, 1997 court order.

(18) The test for "deemed approval" is whether information as to the particular defects in the plan, the requirements which have not been met, and the specific

sections of the statute or ordinance relied upon is contained within the "four corners" of the written decision itself. *Bensalem v. Blank*, 114 Pa. Commw. 493, 539 A.2d 948 (1988).

(19) In this case, the board made no attempt to identify which of the numerous objections set forth in the second denial resolution related to the revised phase I subdivision plan until the date of the hearing on the motion for peremptory judgment.

(20) Accordingly, section 508(2) requires that the revised phase I application and revised phase I subdivision plan be deemed approved.

(21) Notwithstanding that the board rejected the wrong plan the board offered the testimony of the township engineer, planning consultant and sewer consultant to purportedly show that the revised phase I subdivision plan does not comply with the provisions of the township zoning ordinance and SALDO. Evidence as to the substance of the board's decision is not relevant to an action for "deemed approved." *Croft v. Board of Supervisors of Middletown Township*, 76 Pa. Commw. 488, 493, 464 A.2d 625, 627 (1983). See *Clepper Farms Inc. v. Trimmer*, 66 Pa. Commw. 326, 443 A.2d 1385 (1982).

We therefore enter the following:

## ORDER

And now, January 19, 2000, after hearings conducted before the undersigned in a bench trial upon plaintiffs' mandamus action filed against the township on September 3, 1998, which hearings took place on April 16, June 7, July 7 and August 16, 1999, and upon consideration of the respective parties' requests for findings of fact,

conclusions of law and memoranda, this court orders and directs the following:

(1) Plaintiffs' revised phase I subdivision plan submitted to the township on November 18, 1997, pursuant to an order of this court of December 12, 1997, is "deemed approved" upon the failure of the township to comply with 53 Pa.C.S. §10508 on or before July 31, 1998.

(2) Judgment is entered against the board of supervisors of Buckingham Township and in favor of plaintiffs in the mandamus action.

(3) The board of supervisors of Buckingham Township shall approve forthwith the revised phase I subdivision plan filed by plaintiffs on November 18, 1997.

In entering this order, we recognize that "deemed approved" of this revised phase I subdivision plan is only a preliminary step in the application process and that further proceedings will be necessary under the subdivision ordinance and, therefore, we further order and direct that:

(4) The board of supervisors of Buckingham Township shall act in good faith in the processing, review and adjudication of all matters relating to the proposed development.

This court retains jurisdiction over this matter to insure that all aspects of this order are complied with.